ÁNGEL LUIS RÍOS PÉREZ ET AL., demandantes y recurridos, *v.* AUTORIDAD DE LAS FUENTES FLUVIALES, demandada y recurrente.

*Número:* R-62-245          *Resuelto:* 14 de junio de 1966

*José Antonio Arabía,* abogado de la recurrente; *B. Quiñones Elías, S. Quiñones Elías, Luis A. Garrastegui y Tomás Torres Cortés,* abogados de los recurridos.

Sala Segunda integrada por el Juez Asociado Señor Belaval y los Jueces Asociados Señores Hernández Matos, Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

De las conclusiones de la ilustrada Sala sentenciadora debemos destacar las siguientes: Que la Autoridad de las Fuentes Fluviales de Puerto Rico hizo los estudios, diseño y construcción de la presa de Yahuecas, en Adjuntas, Puerto Rico, terminando la misma en octubre de 1956; que la Autoridad de las Fuentes Fluviales es dueña, supervisa, tiene el control y mantiene el funcionamiento de la referida presa de Yahuecas; que la presa de Yahuecas es una de desviación, tipo gravedad, diseñada y hecha con un muro de hormigón de 75′ de altura desde su parte más profunda; (que) sobre el vertedero de dicha presa la Autoridad de las Fuentes Fluviales instaló unas mamparas de madera así: 8 secciones de 26′ 6″ largo; de éstas, 4 secciones en el centro de 4′ de alto, 2 secciones a la izquierda de 5′ de alto y 2 secciones a la derecha de 6′ de alto; (que) las secciones a que se hace referencia en la conclusión anterior, están separadas por pilastras de concreto. Las mamparas constan de tablones de 23′ 6″ de largo por 1′ de ancho por 2″ de espesor, colocadas en forma horizontal. Estos tablones van adheridos horizontalmente a tubos galvanizados de 4″ de diámetro que, a su vez se colocan en unos huecos de 4″ de diámentro por 32″ de profundidad en el vertedero y se aprisionan con plomo. Estos tubos fueron colocados a 3′ 4″ de uno del otro. Las mamparas van adheridas a unos tubos de hierro; al tubo se le coloca una pieza de madera, o tablón de 2″ de espesor cogidos por tres abraza-

deras en forma de U. Entre tubo y tubo va una pieza de madera clavada de los tablones. Los tablones se colocan aguas arriba. Se utiliza un tensor que va sobre una plancha de hierro que va colocada en el último tablón. Este tensor va anclado a una varilla gruesa que se deja en el vertedero aguas arriba. Se utilizaron 56 tensores en la presa de Yahuecas; que las referidas mamparas de madera fueron diseñadas o utilizadas por la Autoridad de las Fuentes Fluviales con el fin de acaudalar más agua; que el día 4 de noviembre de 1956, para la zona de la presa de Yahuecas cayeron grandes lluvias, motivadas dichas lluvias por el paso del temporal Creta, alrededor de 200 millas al Norte de Puerto Rico; que en la noche del 4 de noviembre de 1956, la presión hidrodinámica desprendió las mamparas de madera, causando una creciente súbita que arrolló y causó la muerte por asfixia por sumersión a los esposos Luis Ríos González y Otilia Pérez Pérez, quienes se encontraban en las cercanías de un sitio conocido por El Paso de Calcerrada, por donde la vecindad pasaba de un lado a otro del río; que desde que las aguas del Río Blanco fueron detenidas por la construcción de la presa Yahuecas, no se producían de la presa hacia abajo, crecientes en el Río Blanco, como la que se produjo en la noche del 4 de noviembre al 5 de noviembre de 1956, ni después de esta fecha se producen crecientes súbitas; que después del 4 de noviembre de 1956 y a la luz de la experiencia de este día, la Autoridad de las Fuentes Fluviales rediseñó y cambió los tensores de las mamparas a fin de que éstos cedieran a mayor altura de agua; que la Autoridad de las Fuentes Fluviales, para el día 4 de noviembre de 1956 y días antes de éste, no tomó precauciones dando aviso o alarma alguna del peligro de que se destruyeran dichas mamparas. Tampoco realizó gestión alguna para quitar o hacer ceder dichas mamparas de forma que se produjese una creciente súbita. Tampoco tenía un empleado, agente, encargado o guardián que abriese compuertas de manera que las aguas se descargaran gradual-

mente; que la Autoridad de las Fuentes Fluviales, al construir y mantener una mampara de madera que, evidentemente, habría de estar sujeta al impacto de la presión hidrodinámica, mamparas que, de por sí, por ser hechas de un material menos resistente que el concreto, son peligrosas e inseguras, con el ejercicio de una prudencia ordinaria pudo evitar la muerte de Luis Ríos González y Otilia Pérez Pérez; que el peso de las autoridades en materia de ingeniería hidráulica, califican este tipo de mamparas no recomendables por no ser confiables, ya que pueden desprenderse e irse río abajo, porque los cálculos sobre resistencia no dan, a veces, el resultado esperado . . . (y) los factores de uso y corrosión traen el fracaso de estos aditivos contrario a lo que se esperaba en los diseños . . . (y así) son infrecuentemente usados, excepto como implementos temporales para dar cabida al lago, pero son inseguros en su acción . . . .

La prueba presenta una tersa, y un tanto abstracta, versión científica de la imposibilidad de una crecida súbita que pudiera producir la muerte por asfixia en una sumersión, presentada por la demandada recurrente y el cuadro dramático, intensamente cercano a la realidad de los hechos que presenta la prueba de los demandantes recurridos. Veamos la versión del testigo Joaquín Ramos, la ventana más despierta ante la adversidad:

"P. Colindan esas cuatro cuerdas suyas con alguna propiedad de la Autoridad de Fuentes Fluviales?

R. Sí, señor.

P. Con qué propiedad?

R. Con la represa de Yahuecas, pero que es Guayabo Dulce.

P. Le pagan algo la Autoridad a usted por el terreno suyo?

R. Sí, señor; me dieron setenta y cinco pesos por expropiación.

P. Y da el agua de la represa en terrenos suyos?

R. Sí.

P. Dígame una cosa, usted vive allí cerca?

R. Al 'laíto' arriba de la represa.

P. Qué distancia hay, más o menos, aproximadamente de la casa suya hasta donde está la muralla?

R. Más o menos, cien a ciento cincuenta metros.

P. Se ve de su casa la muralla esa?

R. Sí.

P. Usted recuerda, usted llegó a trabajar en esa represa con la Autoridad?

R. Sí.

P. Qué trabajo hacía usted?

R. Trabajaba la primera vez de 'watchman' y después como obrero.

P. Cuando estaban construyendo eso?

R. Sí.

P. Usted recuerda si después que la construyeron . . . usted sabe si la noche del 4 al 5 de noviembre de 1956 sucedió algo en aquella represa?

R. Bueno, durante el día 4 estuvo lloviendo todo el día; por la noche nos acostamos a dormir como a las once a doce de la noche. Sentimos el volcán. . . .

P. De qué?

R. De la . . . como una 'esplotación' que hubo en la represa. Entonces. . . .

P. Y qué pasó?

R. Nos 'alevantamos'.

P. Quiénes son nosotros?

R. Yo, un hijo mayor y otro más pequeño.

P. Se levantaron?

R. Entonces, nos paramos al 'laíto' de la casa y vimos el 'jumentín' del agua, según cae la 'esplosión' del agua abajo se veía un 'jumentín'.

P. Según caía el agua? ¿Usted estaba acostado?

R. Entonces, nos paramos al *laíto* de la casa y vimos el 'jumentín' del agua, según cae, la 'esplotación' del agua abajo, se veía el 'jumentín'.

P. Según caía el agua?

R. Sí.

P. Usted estaba acostado durmiendo?

R. Sí.

P. El ruido, ¿cómo era?

R. Como cuando se 'esplota' una barrena hondo, pues, sentimos nosotros la 'esplotación'.

P. Como si explotara? ¿Al otro día, notó algo?

R. Nos fijamos que se había llevado los tablones que tenía.

P. Se los había llevado todos?

R. Sí, señor; todos.

P. Dígame una cosa; usted recuerda si después volvieron a poner alguna madera allí, tablones de esos?

R. Sí; fueron y agrandaron aquello bastante, todo.

P. Después?

R. Sí.

P. Había alguna diferencia entre cómo estaban los tablones antes del río llevárselos y los que estaban después, si recuerda, si notara?

R. Había una distancia más o menos de seis pies, de uno a otro estaban los cables.

P. Cuándo?

R. Antes.

P. Y después?

R. Ahora están más pegados.

P. Dígame una cosa, usted sabe si la Autoridad de Fuentes Fluviales tenía allí algún hombre para avisarle a la gente abajo, en el barrio?

R. No había ninguno.

P. Nada más S. S., eso es todo."

■■ Hemos estudiado la prueba con tranquilidad y aprecio para el estudio analítico de los abogados de ambas partes y estamos satisfechos que las conclusiones de la ilustrada Sala sentenciadora reflejan el balance más racional y justiciero de la prueba en el presente caso. En lo que no podemos estar conforme con la ilustrada Sala sentenciadora es en el montante de las compensaciones asignadas a los demandantes. La única razón por la cual se les compensa es porque "a excepción de Josefa Ramona Ríos Pérez, todos sus demás hijos y demandantes en este caso, dependían de ellos totalmente para su subsistencia". Suponemos que a la demandante Josefa Ramona Ríos Pérez se le compensa por sufrimientos morales (*pecunia doloris*).

Tomando como punto de partida la fecha del accidente, y el cuadro de dependencia por razón de familia, o la tasa de esa imponderable pérdida de compañía y sufrimiento moral que produce la muerte de un familiar, concederemos las siguientes compensaciones: a Josefa Ramona Ríos Pérez, $7,500.00; a Ángel Luis Ríos Pérez, $8,000.00; a María Eroilda Ríos Pérez, $9,000.00; a José Ramón Ríos Pérez, $10,000.00; a Olga Iris Ríos Pérez, $11,000.00; a Luz Nilda Ríos Pérez, $11,000.00; a Wilfredo Ríos Pérez, $11,000.00; a Héctor Luis Ríos Pérez, $12,000.00. Consideramos, asimismo, excesiva la cantidad de $20,000.00 para honorarios de abogado y la reduciremos a la cantidad de $7,000.00.

*Debe confirmarse la sentencia, así modificada.*